UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JANET G. WILSON,

    Plaintiff(s),

 v.

BLOCKBUSTER, INC., and JASEN McDANIEL,

    Defendant(s).

NO. C06-800MJP

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

  The above-entitled Court, having received and reviewed:

1. Defendants' Motion for Summary Judgment (Dkt. No. 14)

2. Plaintiff's Memorandum in Opposition (Dkt. No. 19)

3. Defendants' Reply in Support of Motion for Summary Judgment (Dkt. No. 28)

and all exhibits and declarations attached thereto, makes the following ruling:

  IT IS ORDERED that the motion is GRANTED, and Plaintiff's claims are DISMISSED with prejudice.

**Background**

  In October 2002, Plaintiff applied for employment with Defendant Blockbuster, a retail chain which sells and rents movies and games. In the employment application she filled out, Plaintiff

> acknowledge[d] that if I become employed, I will be employed at will, which means that I will be free to terminate my employment at any time for any reason and Blockbuster is free to terminate my employment at any time for any reason except as prohibited by law.

Def. Mtn., Reed Decl., Exh. A, p. 2.

  That same month, Defendant hired Plaintiff as a District Leader ("DL"). Shortly after hiring, she was required to sign an acknowledgement that she had received, read and understood the

**ORDER ON MTN
FOR SUMM JMT - 1**

Blockbuster Employee Handbook ("'98 Handbook"). Def. Mtn., Reed Decl., Exh. D. She also signed a Confidentiality Agreement (Reed Decl., Exh. C) which stated:

> You understand that you are being hired as an at-will employee. What this means is that your employment can be terminated by you or the Company at any time, with or without notice, and with or without cause. This Agreement does not alter your at-will employment status, and does not provide you with any guarantee or promise of continued employment (unless you have a written agreement to the contrary signed by an officer of Blockbuster).

The Handbook was revised in 2003 ("'03 Handbook") and Plaintiff again acknowledged receipt and understanding in writing. Reed Decl., Exh. E. The '03 Handbook contained a progressive discipline policy, a commitment to fair treatment and descriptions of numerous other responsibilities, privileges, and benefits. It also contained a section which read:

> This handbook is not an employment agreement or contract. It also does not guarantee any fixed terms or conditions of employment. Your employment is "at will" and is not for any specific length of time. You may resign at any time, without prior notice, and for any reason. Blockbuster may also terminate your employment at any time, without prior notice and for any reason (except as prohibited by applicable law). No one may alter the at-will nature of your employment other than in a written Employment Agreement signed by an Officer of Blockbuster.

Def. Mtn., Kane Decl., Exh. B, p. 3.

Following a period of training, Plaintiff was assigned District 385, twelve stores in the Tacoma, Aberdeen, Kitsap Peninsula area. The District was an acknowledged "troubled" district, with higher-than-average rates of employee turnover, financial underperformance and theft. Def. Mtn., p. 6.

With the appointment of Plaintiff, four out of the ten DL's reporting to Defendant Jasen McDaniel (Regional Director of Operations, Plaintiff's immediate supervisor and the man who hired her) were women. Plaintiff and McDaniel met monthly in 2003, and Plaintiff felt that McDaniel was initially very responsive and supportive. Wilson Depo., pp. 189, 213. McDaniel asserts (and Plaintiff does not deny) that throughout 2003 District 385 failed to achieve budgetary benchmarks in such areas as Total Net Revenue to Budget, Operating Profit Margin, Net Bad Debt, and Gross Margin.

**ORDER ON MTN FOR SUMM JMT - 2**

1 Additionally, in May 2003, Plaintiff received a written warning for a violation of a payroll policy (a
2 policy of which she claimed ignorance). McDaniel Decl., ¶ 7.

3       In January 2004, Plaintiff received her performance evaluation for 2003.  McDaniel Decl., Exh.
4 B.  She received an overall rating of "met expectations," with approximately one-third of her itemized
5 ratings falling in the "partially met expectations" category.  Plaintiff did not dispute the rating nor
6 complain at the time that it was the result of discrimination.

7       The district did not improve its performance throughout 2004.  Def. Mtn., p. 8, fn 4.  Plaintiff
8 herself acknowledged at her deposition that she "didn't have a district which performed."  Wilson
9 Depo., 363:19-22.  In September 2004, Defendant McDaniel met with Plaintiff and told her he
10 thought she should seek other employment.  According to Plaintiff's recollection of the conversation,
11 McDaniel told her that if she did not leave voluntarily, he would "document her out."  Id., 356:25 -
12 357:1.  Plaintiff was shocked, and contacted the Regional HR Director, Joyce Cameron.  She believed
13 (but could not recall with certainty) that she discussed gender bias as a possible motive.  Id., 359:22-
14 361:5.  She recalled speculating that McDaniel's actions might be a possible backlash from another
15 payroll incident in the spring of that year[1].  Id., pp. 358:3-8. 358:25-359:8.

16       In February 2005, Plaintiff received her 2004 performance evaluation.  Her overall rating
17 dropped to "Partially Met Expectations."  She was the only one of the nine DL's in McDaniel's region
18 (three of whom were also women) who received lower than a "met expectations" rating.  In response
19 to this sub-par evaluation, McDaniel prepared a 60-day Performance Action Plan to track Plaintiff's
20 improvement in particular areas; Plaintiff was given a week to file her response to the proposals in the
21 plan, but did not do so. McDaniel Decl., ¶¶ 11, 12.  Plaintiff's position is that she was being set up,
22 that she was not in need of performance improvement and therefore she did not participate.  Wilson

---

[1] An incident had occurred in June 2004 where an employee in one of Plaintiff's stores was pistol-whipped during a robbery and missed two days of work as a result.  Plaintiff wanted to pay him for the missed days.  Although authorization for that payment eventually came through channels, by the time it was communicated to Plaintiff, she had already authorized the payment on her own.

**ORDER ON MTN**
**FOR SUMM JMT - 3**

1  Depo., pp. 377-78.  What she did instead was write to HR Director Cameron and Blockbuster

2  President Nick Shepard and complain of gender discrimination and retaliation.  Def. Mtn., Tuvim

3  Decl., Exh. E, F, G.

4  Although Plaintiff claims there was no investigation of her complaint, the evidence suggests

5  otherwise.  She recalls being contacted by Cameron and being told "[t]he performance plan stands, the

6  action plan stands, and . . . if you two can't get along that [you should] leave. . . " Wilson Depo., p.

7  408-09.  There is an April 1, 2005 e-mail from Paul Gray (Vice President of Corporate HR) to Nick

8  Shepherd regarding Plaintiff which states: "I spoke with her, reviewed her information she sent me and

9  found absolutely nothing actionable."  Def. Mtn, Tuvim Decl., Exh. G.  An April 8, 2005 e-mail was

10  also submitted in evidence from Joyce Cameron to Plaintiff which stated: "Your communications have

11  been reviewed and we find no reason to change our direction."  Def. Mtn., Kane Decl., Exh. D.

12  Plaintiff continued to meet with McDaniel during the course of the Action Plan, but provided

13  none of the weekly updates which the plan required.  On April 25, 2005, she met with McDaniel and

14  the Regional Loss Prevention Director and she was terminated.  Defendants note that the next three

15  DL's hired by McDaniel were women and that, at present, six out of the ten DL's in McDaniel's

16  region are women.  McDaniel Decl, ¶ 15.

17  Plaintiff filed suit against Defendants alleging five causes of action: (1) breach of contract or

18  promise of specific treatment in specific situations; (2) disparate treatment based on gender in violation

19  of the Washington Law Against Discrimination ("WLAD"), RCW 49.60 et seq.; (3) termination in

20  violation of public policy; (4) disparate treatment based on gender in violation of Title VII of the Civil

21  Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII"); and (5) retaliation in violation of Title

22  VII and WLAD.

26  **ORDER ON MTN**
**FOR SUMM JMT - 4**

**Analysis**

Standard of review

Summary judgment is not warranted if a material fact exists for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). The underlying facts are viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if. . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). This can be done be either producing evidence negating an essential element of plaintiff's claim, or by showing that plaintiff does not have enough evidence of an essential element to carry its ultimate burden at trial. Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).

However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Copr. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. Id.. At 324. In considering a motion for summary judgment, however, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Anderson, 477 U.S. at 250-51.

Termination in violation of public policy

To sustain this cause of action, a plaintiff must establish (among other elements) that discouraging his or her conduct would jeopardize a public policy. Korslund v. Dynecorp Tri-Cities

**ORDER ON MTN
FOR SUMM JMT - 5**

Svcs., Inc., 156 Wn. 2d 168, 178 (2005). However, as a matter of law, a plaintiff cannot satisfy this "jeopardy element" if an adequate remedy already exists to protect the public policy allegedly violated. Id. at 182-83. Plaintiff agrees with Defendants that this cause of action is insupportable because WLAD already provides an adequate remedy at state law for gender discrimination. On that basis, she stipulates to its dismissal.

Breach of contract/breach of a specific promise

Plaintiff claims that the contents of the '03 Handbook constitute a contract between herself and Blockbuster, and that the company's failure to adhere to all the policies and promises (most specifically, the "progressive corrective action" policy and the promise of fair treatment and investigation of complaints) were breaches of that contract.

In order to establish that the handbook created a contract, Plaintiff must present evidence of an offer, an act of acceptance and consideration. Bulman v. Safeway, Inc., 144 Wn.2d 335, 351-52 (1992); *see also* Roberts v. Atlantic Richfiled Co., 102 Wn.2d 219, 224 (1984) (which holds that an employee's subjective understanding regarding employment terms does not create an implied agreement). Plaintiff's chain of logic in making this argument is fatally flawed. She points to an agreement she signed upon receipt of the '03 Handbook[2] and claims that, upon her signing of that agreement, the handbook became a contract between herself and the company. The agreement (entitled a "Policy Acknowledgement") reads:

> This is to acknowledge that I have received a copy of the following documents:
> • Blockbuster Inc. Employee Handbook (revised 1/03)
> • Zero-Tolerance Theft Policy
> • Zero-Tolerance Harassment Policy
>   • California employees must also receive Form DFEH-185 Sexual Harassment is Forbidden by Law information sheet
> I will familiarize myself with the materials outlined above and understand I am governed by the contents provided in these materials.

---

[2] In her complaint, Plaintiff denies that she was instructed that the new handbook was applicable to her or that she signed an acknowledgement that she had read and understood its contents. Complaint, ¶ 5.4. No reference to this claim occurs in the briefing of either party.

**ORDER ON MTN**
**FOR SUMM JMT - 6**

Def. Mtn., Reed Decl., Exh. E.

This opinion has previously alluded (*supra*, p. 2) to the provision in the '03 Handbook expressly stating (1) the handbook was not a contract and (2) employment with Defendant was at-will. Kane Decl., Exh. B, p. 3.  Therefore, part of what Plaintiff was agreeing to be governed by were these two very specific disclaimers about the nature of the handbook and the nature of her employment.

In an attempt to defend her legal theory, Plaintiff points to a sentence in the "no contract/at-will disclaimer" section of the '03 Handbook which states "No one may alter the at-will nature of your employment other than in a written Employment Agreement signed by an Officer of Blockbuster." Id. She then proceeds to argue that her signing of the "Policy Acknowledgement" constituted the written modification of the at-will nature of her employment.  This is insupportable.  What Plaintiff signed is not an "Employment Agreement" and is not signed by an officer of the company; nor is there anything in the "Policy Acknowledgement" which states that it modifies anything in the handbook.  On the contrary, she agrees to be bound by its contents, which include the denial of any resulting contract between employee and employer and the affirmation that she is an at-will employee.

Plaintiff's argument that the policy statements regarding "progressive corrective action," and fair treatment (including no tolerance of harassment and investigation of all complaints) constitute "promises of specific treatment in specific situations" fares no better.   Again, the handbook is quite clear:

[This handbook] does not guarantee any fixed terms and conditions of employment.

Kane Decl., Exh. B, p. 30.  A "promise" in an employment manual "is not binding if its performance is optional or discretionary on the part of the promisor."  Hill v. J.C. Penney, Inc., 70 Wn.App. 225, 236 (1993).

Finally, Plaintiff attempts to argue that "[t]he disclaimers were not conspicuously stated." Pltf. Response, p. 16.  This argument is considerably undercut by the fact that the information on which

**ORDER ON MTN
FOR SUMM JMT - 7**

Plaintiff relies for her arguments regarding modification of the at-will nature of her employment and the existence of a progressive corrective action policy (Kane Decl., Exh. B. at pp. 30, 44) are found on the same pages where the disclaimers of "no contract" and "at-will employment" appear. Plaintiff has failed to create a genuine dispute of any material fact concerning the contractual nature of the '03 Handbook or the written modification of her employment terms by means of some alternate agreement.

In the final analysis, for purposes of legal liability, it does not matter whether Blockbuster kept the "promises" made in their handbook concerning progressive corrective actions towards Plaintiff or investigation of her complaints of discrimination and retaliation. Plaintiff was an at-will employee and unless she can establish that Defendants treated her unlawfully (i.e., acted or failed to act because of gender bias), the fact that they may have treated her unfairly or in a manner inconsistent with their employee handbook is not actionable. Defendants are entitled to summary judgment as a matter of law on Plaintiff's contractual cause of action.

Disparate treatment on the basis of gender (Title VII and WLAD)

Both the federal and state statutory schemes employ the shifting-burden analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[3] Plaintiff must first establish a prima facie case of discrimination through proof that (1) she belongs to a protected class, (2) she was qualified for the position, (3) she was subjected to an adverse employment action, and (4) similarly-situated men were treated more favorably. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002); Domingo v. Boeing Employees' Credit Union, 124 Wn.App. 71, 80 (2004).

Defendants dispute whether Plaintiff was even qualified for her position, but do not maintain that her alleged lack of qualifications is fatal to her claim. Blockbuster and McDaniel argue instead

---

[3] "Washington courts have largely adopted the federal protocol announced in McDonnell Douglas for evaluating motions for judgment as a matter of law in discrimination cases brought under state and common law..." Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 180 (2001).

ORDER ON MTN
FOR SUMM JMT - 8

that Plaintiff has no admissible evidence that men were treated differently than she was. In reviewing those portions of Plaintiff's deposition testimony which the parties provided, the Court has found little or nothing in Plaintiff's descriptions of disparate treatment which could be considered actionable gender discrimination. *See* Wilson. Depo, pp. 204-13.

In response to Defendant's motion, Plaintiff cites to the declarations submitted by herself and another employee (Store Manager Teresa Tucker) as supporting her claims of disparate treatment. As the citations are without specificity, the Court is left to speculate about which allegations she refers to, but the following appear to fall under the general description of possible disparate treatment:[4]

PLAINTIFF'S DECLARATION:

A.  ¶ 8f: At a monthly business meeting, Plaintiff "overheard discussion by male District Leaders that they had received written performance reviews" when she had received none. (Defendant objects to the hearsay nature of this statement; the objection is well-taken and this evidence – for which Plaintiff provides no admissible corroboration – will not be considered.)

B.  ¶ 9: Plaintiff had requested unsuccessfully that some stores in her district either be shut down or allowed to close early. Following her termination (and replacement by a male DL) one store was shut down and another allowed to cut its hours.

C.  ¶ 10f: "I told [HR Mgr Joyce Cameron] that McDaniel appears to treat the male District Leaders with more respect and consideration than the female District Leaders." (Defendant objects to this as "conjecture, speculative and conclusory;" the Court agrees that it is inadmissible as conclusory.)

---

[4] Defendants filed objections to portions of the both Plaintiff's and Tucker's declarations. This opinion will address those objections as they concern the examples from both declarations which the Court has cited.

**ORDER ON MTN**
**FOR SUMM JMT - 9**

D. ¶ 10j: "Other male District Leaders were allowed to place employees who wanted advancement and were working toward certification in a higher position in what was called a stretch assignments in the higher position on a temporary basis," while Plaintiff was denied that option. (Defendant objects on the basis of lack of foundation. Plaintiff provides no admissible documentary or corroborative evidence that this occurred, and the Court will not consider this evidence.)

E. ¶ 11g: "On the day I was terminated from employment, two males, Jim Romano and John Andrews were assigned my stores within their respective Districts. District 385 ceased to exist." ( Even setting aside the issue that Plaintiff provides no documentary support for this claim, it is unclear how this constitutes proof that "similarly situated males were treated differently.")

DECLARATION OF TERESA TUCKER:

A. ¶ 2: Tucker mentions that, following Plaintiff's termination, she was removed from her Store Manager position by the new (male) DL and replaced by an allegedly unqualified female Assistant Store Manager. (Plaintiff offers no explanation of how this constitutes disparate treatment of Plaintiff on the basis of gender.)

B. ¶ 11: Following Plaintiff's termination, the new (male) DL requested that a store which had been robbed twice be permitted to close early. That request (which had been denied when Plaintiff made it) was granted.

C. ¶ 16: "I witnessed Janet being treated differently than the male District Leaders Jim Romano and John Andrews. Janet had to be in our stores. The male District Leaders I worked under did not. Janet had to work peak shifts on Friday or Saturday nights. I did not see the male District Leaders on Friday and Saturday nights. . . Janet made sure [the "planning board"] was done according to the team engagement program. Jim

**ORDER ON MTN FOR SUMM JMT - 10**

|   |   |   |
|---|---|---|
|   |   | Romano never cared about the planning board when he took over after Janet was terminated. He told me that Jasen [McDaniel] doesn't require him to do that, the planning board." (Plaintiff here provides no evidence that it was at Defendant McDaniel's – or anyone else's – direction that Plaintiff "had to be in [the] stores" or had to work on Friday and Saturday nights. Romano's statement is inadmissible hearsay.) |
|   | D. | ¶ 15[5]: McDaniel said nothing when Tucker's store received a perfect inspection rating; when another store in a male DL's district received a perfect score, McDaniel publicized it throughout the region. (Again, Plaintiff was a District Leader, not a store manager; this is not evidence of how males situated similarly to <u>Plaintiff</u> were treated differently.) |
|   | E. | ¶ 16 (2nd ¶ 16)[6]: On a tour of stores in other districts, Tucker saw stores in much worse shape than Plaintiff's which had been given higher ratings by McDaniel than Plaintiff's stores. |

It is generous to conclude that, even viewed in the light most favorable to Plaintiff, the portion of this evidence which is admissible creates a prima facie case for disparate treatment on the basis of gender. But once the burden is shifted to Defendants to offer a legitimate explanation and Plaintiff is required to establish that Defendants' reasons are pretextual, this cause of action truly falters. Between the insubstantial nature of her prima facie case, Defendants' documented business reasons for finding her performance unsatisfactory and the strong presumption in Defendants' favor on the basis

---

[5] This paragraph is mis-numbered in Tucker's declaration.

[6] This paragraph is mis-numbered in Tucker's declaration.

**ORDER ON MTN
FOR SUMM JMT - 11**

of the "same actor" doctrine, Plaintiff's gender discrimination claims are not strong enough to survive summary judgment.

Assuming arguendo that Plaintiff has established a prima facie case for discrimination, Defendants still have: (1) a legitimate business reason for terminating Plaintiff and (2) the right to terminate her as an at-will employee. Additionally, Plaintiff has failed to overcome the inference created by the "same actor" doctrine.

Defendants have produced evidence that Plaintiff's district was underperforming; Plaintiff herself admitted in deposition that "I didn't have a district that performed." Pltf Depo., p. 363. Plaintiff does not claim that Defendants' allegations about the poor numbers in her district were false. She does claim that she was being set up to fail, but even if that is true it is not the same thing as proving that she was being treated unfavorably because she was a woman. As an at-will employer, Defendants do not have to demonstrate good cause for terminating her.

Plaintiff's remaining obstacle in proving that Defendants' proffered reasons are pretextual is the "same actor" doctrine. Both the Ninth Circuit and Washington observe the principle that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir. 1996). Just how strong was articulated in Coghlan v. American Seafoods Co. LLC, 413 F.3d 1090, 1097 (9th Cir. 2005): A plaintiff must "muster [an] extraordinarily strong showing of discrimination" to overcome the same-actor inference." (emphasis supplied.)

In addition to the fact that he both hired and terminated Plaintiff, Defendants' evidence further establishes that McDaniel has a history of hiring women into positions of responsibility – when Plaintiff was initially hired, she was the fourth woman among the ten DL's under McDaniel's supervision; at present, six of the ten DL's are women. Defendants argue further that McDaniel was not gender-

**ORDER ON MTN  
FOR SUMM JMT - 12**

biased, merely intolerant of underperforming management personnel. Plaintiff's predecessor was a male terminated for policy violations and Plaintiff acknowledged at deposition that two male DL's whom she believed were operating in violation of company policy were no longer working for Blockbuster by the time she left. Pltf Depo., p. 338.

Plaintiff argues that the "same actor" inference should not be applied because McDaniel did not find out until after he hired her that she did not "conform to his expectations of women," that "[h]e expected her to confirm [*sic*] to the discriminatory stereotypes of woman [*sic*]." Pltf. Response, p. 18. There is no evidentiary support offered for this highly conclusory opinion. Plaintiff's citations to two law review articles which challenge the validity of the "same actor" inference are hardly persuasive authority next to Ninth Circuit and Washington precedent which adopt the doctrine.

Plaintiff has not made an "extraordinarily strong showing of discrimination," certainly not enough to raise a genuine issue of material fact regarding whether her termination was either discriminatory or pretextual. Defendants are entitled to summary judgment on the state and federal claims of gender discrimination.

Retaliation

A prima facie case for retaliation requires that Plaintiff establish that she (1) suffered an adverse employment action (2) after engaging in statutorily protected activity and that (3) a causal link exists between the activity and the retaliatory act. Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); Delahunty v. Cahoon, 66 Wn.App. 829, 839 (1992).

Plaintiff does not state in her complaint what her protected activity was or what constitutes the causal link between that activity and her termination. In her response to Defendants' motion, Plaintiff claims that the "unfair [2004] evaluation and [Performance Action] plan" were retaliatory acts in response to her complaints of discrimination to Cameron following the September 2004 meeting where McDaniel invited her to quit or be "documented out." Pltf. Response, p. 19. According to her

**ORDER ON MTN FOR SUMM JMT - 13**

theory, her complaints of discrimination following the September 2004 meeting were the "protected activity" and there is a causal link between her next performance evaluation and the performance action plan which she alleges was a setup to terminate her. (She also claims that her decision to "stand up" to McDaniel in relation to the payment of the pistol-whipped employee earned his retaliatory ire (Pltf. Decl., pp. 9-10, 13), but nowhere does she claim that her unilateral decision to pay the injured employee was a "protected activity." Therefore the June 2004 incident will not support a retaliation claim.)

There is a disputed issue of material fact regarding whether Plaintiff actually complained to Cameron of discrimination in the phone call following the September 2004 meeting with McDaniel. It is unquestioned that, following receipt of the Performance Action Plan and 2004 evaluation in February 2005, she complained of discrimination to Cameron and Blockbuster President Nick Shepherd. Tuvim Decl., Exh. E, F. Her complaint certainly reached Vice President of Corporate HR Paul Gray, because he references it in an e-mail to Shepherd (where he concludes that it is "not actionable"). Id., Exh. G.

However, all of these disputed and undisputed facts are irrelevant in the face of two facts about which there is no disagreement. First, Plaintiff made no (documented) complaints about possible gender discrimination until after her conversation with McDaniel in September 2004.[7] Second, by the time of the September 2004 conversation, McDaniel had already decided to terminate Plaintiff – she was given the choice of leaving voluntarily or having McDaniel "document her out." Since the decision to terminate Plaintiff pre-dates any of her protected activity, there can be no causal link between the two and therefore no retaliation cause of action. Defendants' motion for summary judgment of dismissal of this claim will be granted.

---

[7] In her declaration, Plaintiff alludes to a comment she made to Regional HR Manager Cindi Kane in December 2003 that she "hoped McDaniel was not 'discriminating against women.'" Pltf. Decl., ¶ 8d. The Court finds that this speculative, provisional statement does not rise to the level of a complaint about disparate or discriminatory treatment and cannot form the basis for a claim of retaliation.

**ORDER ON MTN FOR SUMM JMT - 14**

**Conclusion**

Plaintiff concedes that her claim for termination in violation of public policy is without legal foundation. The Court finds that there are no genuine issues of material fact regarding her remaining claims, and that, as a matter of law, Defendants are entitled to summary judgment on her claims of breach of contract, disparate treatment in violation of Title VII and WLAD, and retaliation. Summary judgment will be GRANTED to Defendants, and Plaintiffs' claims will be dismissed with prejudice.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: July __2__, 2007

Marsha J. Pechman
U.S. District Judge

**ORDER ON MTN**
**FOR SUMM JMT - 15**